# United States Tax Court

T.C. Memo. 2025-86

WHISTLEBLOWER 20442-18W,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 20442-18W.                    Filed August 11, 2025.

————

*Adam L. Pollock*, for petitioner.

*Aimee R. Lobo-Berg*, *Matthew A. Cappel*, *Zachary A. Gray*, *Darrick D. Sun*, *Sophia L. Wang*, and *Julie V. Skeen*, for respondent.

## MEMORANDUM OPINION

LAUBER, *Judge*: In this whistleblower award case petitioner seeks review pursuant to section 7623(b)(4)[1] of a final decision by the Internal Revenue Service (IRS or respondent) to deny a claim for an award. The IRS teams that conducted the examination of the target taxpayer made "adjustments to several issues related to the whistleblower allegations." But the claim was denied "because the IRS identified the issues prior to receipt of [petitioner's] information and [the] information did not substantially contribute to the actions taken by the IRS."

Respondent has filed a Motion for Summary Judgment contending that the denial of petitioner's claim was not an abuse of discretion.

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

[*2] In so contending respondent relies in part on Treasury Regulation § 301.7623-2(b)(1), which defines the statutory phrase "proceeds based on." That regulation explains that "the IRS *proceeds based on* information provided by a whistleblower when the information provided substantially contributes to an action against a person identified by the whistleblower." Because petitioner's information did not "substantially contribute" to the adjustments made during the examination, respondent contends that petitioner is not entitled to an award.

In *Lissack v. Commissioner*, 157 T.C. 63 (2021), this Court upheld the substantive and procedural validity of Treasury Regulation § 301.7623-2(b)(1). Our decision was affirmed by the U.S. Court of Appeals for the D.C. Circuit. *See Lissack v. Commissioner* (*Lissack I*), 68 F.4th 1312 (D.C. Cir. 2023). In sustaining the regulation's validity, both courts applied the framework set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

On June 28, 2024, the U.S. Supreme Court overruled *Chevron*. *See Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024). It accordingly vacated the D.C. Circuit's judgment in *Lissack* and remanded the case for further consideration in the light of *Loper Bright*. *See Lissack v. Commissioner*, 144 S. Ct. 2707 (2024) (mem.). On August 5, 2024, petitioner filed a First Supplement to Opposition to Respondent's Motion, drawing our attention to the Supreme Court's decision.

By Order served October 16, 2024, we held respondent's Motion in abeyance pending the D.C. Circuit's decision on the *Lissack* remand. On January 10, 2025, the D.C. Circuit issued a second opinion in *Lissack*, which adhered to its original holding and sustained the validity of Treasury Regulation § 301.7623-2(b)(1). *See Lissack v. Commissioner* (*Lissack II*), 125 F.4th 245 (D.C. Cir. 2025), *aff'g* 157 T.C. 63. On June 16, 2025, the parties at our request filed supplemental memoranda addressing the impact of that opinion on this case. Having considered those filings and the record as a whole, we will grant respondent's Motion and sustain the IRS's determination.

## Background

The following facts are derived from the Pleadings, the parties' Motion papers, the Declarations and Exhibits attached thereto, and the administrative record filed with the Court, as supplemented. *See* Rule 121(j). Appeal of this case would presumptively lie to the D.C. Circuit.

[*3] *See* § 7482(b)(1) (penultimate sentence); *Berenblatt v. Commissioner*, 160 T.C. 534, 542 n.4 (2023).

I.     *Petitioner's Claim for Award*

In April 2012 the IRS Whistleblower Office (WBO) received from petitioner Form 211, Application for Award for Original Information. The taxpayer identified in petitioner's claim is a large multinational corporation, to which we will refer as "Target." Petitioner alleged underpayments of tax by Target for tax years 2007–2011.[2]

According to petitioner, the supposed underpayments of tax arose from Target's failure to comply with transfer pricing regulations promulgated under section 482. Petitioner alleged that Target for 2007–2011 "ha[d] not allocated any U.S. head office executive management services expenses to controlled foreign subsidiaries." Petitioner expressed a belief that the IRS "ha[d] issued an advance pricing agreement [APA] covering [Target's] cost sharing arrangement [CSA] for research and development [R&D] costs (including buy-in payment)." Petitioner raised questions about the propriety of the CSA buy-in payments and cost pools and asserted that the IRS "has never examined [Target's] other intercompany transactions." Those other transactions allegedly included "allocations of intercompany services . . . , trademark license fees, access to [Target's] global proprietary network . . . , [and] U.S. developed internal policies and procedures (franchise intangibles)," which were allegedly "developed from U.S. knowhow and trade secrets." Petitioner also alleged that Target had used a tax-avoidance structure "to shield its income from subpart F taxation."

The Form 211 provided no factual detail about any of these issues, much less a roadmap that would assist the IRS in ascertaining where the bodies were buried. Rather, petitioner listed transfer pricing issues that commonly arise for large multinational companies and expressed a belief that the IRS could secure a tax recovery by examining these issues. The factual data appearing in the claim appear to have been derived from Securities and Exchange Commission (SEC) filings by Target and from reports prepared by financial analysts who covered the company.

---

[2] By Order served July 23, 2019, we granted petitioner's motion to proceed anonymously in this case. For convenience we occasionally refer to petitioner using the pronoun "he" and the possessive adjective "his." This usage says nothing about petitioner's actual gender.

[*4]   On April 25, 2012, the WBO sent petitioner a letter acknowledging receipt of the Form 211 and assigned Senior Tax Analyst (STA) Felipe Castellanoz to the claim.  On May 10, 2012, the Form 211 was forwarded to the Office of IRS Chief Counsel for a "taint review."  *See Internal Revenue Manual* (IRM) 25.2.1.4.3(5) (Jan. 11, 2018).  This review is designed to ensure (among other things) that the information supplied by the whistleblower was not obtained illegally or subject to a valid claim of privilege.  *Ibid.*

The "taint review" process was completed on June 19, 2013.  One week later, on June 26, 2013, the Form 211 was forwarded to Team Manager Alicia Tobin of Group 1235, a component of the IRS Large Business and International Division (LB&I).  Team 1235, with the assistance of Team 1313, was conducting the examination of Target's 2007–2009 tax years.  Members of a different LB&I team, Team 1316, were assigned to the next audit cycle, i.e., the examination of Target's 2010–2012 tax years.

II.   *The Examination of Target*

The IRS had commenced its examination for Target's 2007 and 2008 tax years in June 2010.  The 2009 tax year was added to this examination in June 2011.  In July 2011 the examination teams briefed senior management regarding Target's foreign legal structure and certain audit issues that had been identified, including the APA, the CSA, the relative profitability of the U.S. and foreign entities, intercompany revenues and expenses, transfers of intangible property (IP), and royalties properly payable for IP.

As of June 2013 the teams conducting Target's 2007–2009 examination had already developed a number of transfer pricing issues.  These included the allocation of cost pools under the CSA, the accuracy of buy-in payments under the CSA and the APA, allocations for intercompany services, allocations of headquarters expense, and allocations of contingent royalties for IP transfers not covered by the CSA.

As of June 25, 2013—the day before petitioner's information was forwarded to Ms. Tobin—the exam teams had issued 369 initial document requests (IDRs) to Target.  Most of these IDRs related to transfer pricing issues, e.g., the definition of marketing intangibles, transfers of intangibles, intercompany transactions, license agreements, trademarks, trade secrets, allocation of R&D expense, headquarters cross-charges, executive cross-charges, cost sharing relating to administrative

[*5] services and data center expenses, and multiple issues relating to the CSA and buy-in payments. The exam team had drafted a Notice of Proposed Adjustment (NOPA) for the headquarters cross-charge issues in February 2013.

Petitioner's Form 211 was forwarded to Target's exam team on June 26, 2013. The exam team interviewed and debriefed petitioner the following day. Petitioner indicated that he was not involved in the preparation or review of Target's financial statements or tax returns and that he had no access to Target's accounting records. Instead, he hypothesized the alleged tax violations after reviewing Target's annual filings with the SEC. Petitioner acknowledged that neither he nor the firm by which he was employed did any transfer pricing or tax work during the years at issue.

Petitioner made numerous supplemental submissions to the WBO. Following the required "taint reviews," these submissions were likewise forwarded to Ms. Tobin in Group 1235, which was assigned to the 2007–2009 audit. The last of these submissions was made in July 2016. Although petitioner contends that these submissions expanded his award claim to cover Target's 2012–2015 tax years, he did not file a distinct Form 211 making a claim for those years. Rather, his supplemental submissions consisted of publicly available information, workpapers, and case studies that were created during 2012–2015 or referred to facts or events during that period.

III.  *Evaluation of Petitioner's Claim*

On July 20, 2015, Sylvia Sanders, an International Team Manager in Group 1313, prepared for Ms. Tobin a 21-page memorandum evaluating petitioner's claim for award. At that time the 2007–2009 examination was "winding down," and her memorandum addressed the issues petitioner identified with respect to the 2007–2009 examination only. The memorandum considered the information contained in petitioner's original Form 211 and in supplemental submissions the exam teams had received between August 2013 and June 2015.

Ms. Sanders noted that petitioner was employed by a firm that did SEC filings for multinational companies. The information and analysis petitioner supplied were "based on his professional experience, conversations with colleagues, and the reading of public information, such as [SEC Forms] 10–K, news articles, and publications." Petitioner acknowledged that he had no contact with Target and no access to its

[*6] accounting records, documents, or agreements. Petitioner supplied no services to Target and had no involvement with preparation of its financial statements or tax returns. His understanding of Target's tax structure was derived mainly from his analysis of reserve accounts appearing on its financial statements.

Ms. Sanders's memorandum explained that IRS senior management had been briefed in July 2011 on the 2007–2009 audit issues for Target. The exam teams had issued Target 377 IDRs, 288 of which were directed to the issues petitioner subsequently identified. Not a single IDR relating to the 2007–2009 examination was issued after June 26, 2013, the date on which the exam team first received petitioner's information.

In her memorandum Ms. Sanders addressed each of the legal issues petitioner had listed in the Form 211, including transfer pricing documentation, intercompany services transactions, the APA, the CSA, allocation of cost pools, franchise intangibles, trademark intangibles, royalty payments, network access, and headquarters cost allocations. She explained that the exam teams had identified each of these possible audit issues—and in most cases had completed the relevant field work—before receiving petitioner's information.

On several points Ms. Sanders explained that petitioner's understanding of the facts was incorrect. For example, Target's APA did not cover the CSA, as petitioner alleged. Rather, the APA covered transactions involving Target's preexisting intangibles and "did not require payments after 2010." The appendices to petitioner's Form 211, she noted, consisted of "general information [that] did not provide any specific identification of non-compliance areas that the Exam Team did not already have under examination."

Ms. Sanders next addressed each of the supplemental submissions petitioner had made as of June 2015. Much of this material, she explained, consisted of generic data derived from IRS publications, business school journals, newspaper articles, and SEC filings. In some cases, the exam team found that petitioner's theories were unsupported by documentary evidence or that the information was inaccurate. To the extent petitioner's submissions related to actual audit issues, the exam team had completed field work and/or drafted NOPAs regarding those issues before receiving petitioner's data. Petitioner's supplemental submissions "did not provide any inside information about [Target's] operations that would provide any value to the Exam Team for 2007, 2008

[*7] and 2009, therefore, no new actions were taken with respect to this information." Ms. Sanders summarized her findings as follows:

> The Exam Team concluded that there was no specific inside information provided in the initial Claim [or] in the Supplemental Submissions about [Target's] business operations that had the potential for further audit consideration beyond what the Exam Team had already known and had under examination for tax years 2007 [through] 2009.

On December 8, 2015, Kate Heinemann prepared Form 11369, Confidential Evaluation Report on Claim for Award, addressing petitioner's claim for 2007–2011, the five years set forth in the Form 211. *See* IRM 25.2.1.5.5 (May 28, 2020). Ms. Heinemann was a Senior Team Coordinator for Team 1316, which conducted the examination of Target's 2010–2012 tax years. She attached to the Form 11369 the narrative memorandum Ms. Sanders had prepared in July 2015.

Ms. Heinemann recommended that petitioner's claim be denied because (1) Target was already under examination when LB&I received petitioner's information, (2) the examination teams had issued IDRs to Target before petitioner's information was received, (3) petitioner did not identify any issues not already known to the exam teams, (4) the issues petitioner identified were common to taxpayers like Target and were well understood by the IRS, and (5) petitioner's information did not lead to modifications of LB&I's audit plans. The following day Ms. Heinemann's manager approved and signed the Form 11369.

In April 2017 the 2007–2009 examination of Target closed as "Agreed," with adjustments "to several issues related to [petitioner's] allegations." These adjustments were reflected in a Revenue Agent Report (RAR) that included Form 4549–A, Income Tax Examination Changes. The RAR was included as an attachment to the Form 11369. In December 2017 the 2010–2012 examination likewise closed as "Agreed," with adjustments "to several issues related to [petitioner's] allegations." The RAR for that audit cycle was separately forwarded to the WBO along with the Form 11369 package.

In July 2018, after reviewing the Form 11369 and accompanying information, STA Castellanoz prepared an Award Recommendation Memorandum (ARM) recommending denial of petitioner's claim. He acknowledged that adjustments were made during the 2007–2009 and

[*8] 2010–2012 audit cycles concerning several issues related to petitioner's submissions. But he concluded that the teams conducting Target's 2007–2009 examination had already identified the issues to which the Form 211 referred; that the examination teams had drafted IDRs and NOPAs for manager review by the time they received petitioner's information in June 2013; and that petitioner's information "was of no value to the field team." He summarized the relevant facts as follows:

> The field team concluded that there was no specific inside information provided in the initial claim or in the supplemental submissions about [Target's] business operations that had the potential for further audit consideration beyond what the field team had already known and had under examination. The team did not consider the whistleblower information in the 2010-2012 audit cycle.

On July 31, 2018, the WBO mailed petitioner a preliminary decision recommending denial of the claim. The letter provided petitioner 30 days to submit written comments. He submitted no comments.

On September 17, 2018, the WBO issued petitioner a Final Determination denying his claim for an award. The basis for the denial was that "the IRS identified the issues prior to receipt of your information and your information did not substantially contribute to the actions taken by the IRS." The WBO explained: "The issues you identified were already in the IRS audit plan for the taxpayer, information document requests had been issued, and there were no changes in the IRS approach to the issue[s] after review of the information you provided."

IV. *Tax Court Discovery Proceedings*

On October 17, 2018, petitioner timely petitioned this Court for review of the WBO's determination. In January 2021 respondent produced to petitioner the WBO's complete administrative file for the claim, redacted for privileged information and data protected by section 6103. On December 8, 2021, petitioner filed a Motion to Compel Production of Documents, seeking discovery of material outside the administrative record compiled by the WBO. Specifically, petitioner sought access to documents—"such as NOPAs, IDRs, or RARs, and related correspondence"—from the 2007–2009, 2010–2012, and 2013–2015 examination files for Target.

After receiving numerous supplemental submissions, we denied the Motion to Compel by Order served October 16, 2024. For the

**[*9]** 2007–2009 audit cycle, we concluded that the RAR, together with all NOPAs, IDRs, and other material relevant to the award determination, had been made available to petitioner as part of the designated administrative record.

Petitioner requested similar documents from the 2010–2012 audit cycle. But the only 2010–2012 documents the WBO appears to have considered were the three forms that constituted the RAR. *See* IRM 25.2.1.5.5.1(1)(d) (Jan. 11, 2018) (requiring inclusion of the RAR in the Form 11369 package). The RAR for 2010–2012 was already included in the designated record, and we found no evidence that any other documents relating to 2010–2012 were ever forwarded to or considered by the WBO. As stated in the ARM, the exam team "did not consider the whistleblower information in the 2010–2012 audit cycle." Because the 2010–2012 exam team did not use petitioner's information, it would have had no reason to forward examination file material (such as NOPAs and IDRs) to the WBO for consideration of petitioner's claim.

Petitioner also requested similar documents from Target's 2013–2015 audit cycle. Petitioner conceded that "there is no indication [that] the 2013–2015 tax year documents . . . were considered" by the WBO, but petitioner contended that these files were nonetheless discoverable as "relevant to the award determination." We rejected that contention, as well as petitioner's alternative contention that the supplemental submissions had expanded its claim to include Target's 2013–2015 tax years. Even if that premise were accepted, there was no evidence that the 2013–2015 exam team had received or used petitioner's supplemental submissions.

In sum we concluded that petitioner had failed to show that the designated record omitted material the WBO actually considered or that otherwise fell under a category listed in the applicable regulations. *See Berenblatt*, 160 T.C. at 545–46. And we ruled that petitioner was not entitled to additional discovery on the theory that the IRS had operated in bad faith in connection with the case. *See id.* at 550 (holding that a whistleblower must make "a significant showing" of bad faith).

V.   *Summary Judgment Motion*

On December 9, 2021, respondent filed a Motion for Summary Judgment contending that the WBO did not abuse its discretion in denying petitioner's claim for award. In his Motion respondent relied in part on Treasury Regulation § 301.7623-2(b)(1), which provides that the IRS

**[\*10]** "proceeds based on" information provided by a whistleblower "when the information provided substantially contributes to an action against a person identified by the whistleblower." In *Lissack*, 157 T.C. 63, this Court had upheld the substantive and procedural validity of Treasury Regulation § 301.7623-2(b)(1).

Petitioner timely opposed the Motion, and the parties filed supplemental memoranda as directed by the Court. By Order served September 6, 2022, we held the Motion in abeyance pending our ruling on the discovery matters discussed above and the pending appeal of *Lissack* to the D.C. Circuit. The D.C. Circuit affirmed our decision in *Lissack I*, 68 F.4th 1312, but its judgment was vacated by the Supreme Court and the case was remanded for further consideration in the light of *Loper Bright*. *See supra* p. 2.

On August 5, 2024, petitioner supplemented the Opposition to the Motion. Noting the Supreme Court's remand of *Lissack I*, petitioner reiterated the contentions that Treasury Regulation § 301.7623-2(b)(1) is invalid, that there is no "substantially contribute" requirement in section 7623(b), and that respondent's Motion "is based on a fundamental misinterpretation of [s]ection 7623(b)." On September 12, 2024, respondent filed a status report seeking "an opportunity to brief its position."

By Order served October 16, 2024, we again held respondent's Motion in abeyance pending the D.C. Circuit's disposition of the *Lissack* remand. On January 10, 2025, the D.C. Circuit issued an opinion adhering to its view, sustaining the validity of the regulation, and again affirming our decision. *See Lissack II*, 125 F.4th 245. On June 16, 2025, the parties at our request filed supplemental memoranda addressing the impact of that opinion on this case.

*Discussion*

I. *Jurisdiction*

The Tax Court is a court of limited jurisdiction and may exercise jurisdiction only to the extent authorized by Congress. *See* § 7442; *McCrory v. Commissioner*, 156 T.C. 90, 93 (2021). If, as in this case, the IRS proceeds with administrative action against a target identified by a whistleblower and the WBO declines to grant an award, then the whistleblower may petition our Court for review of the WBO's determination, and we have jurisdiction to review the determination. *See* § 7623(b)(4); *Lissack II*, 125 F.4th 245; *Shands v. Commissioner*, 111 F.4th 1, 9 (D.C.

**[\*11]** Cir. 2024) (noting that the "jurisdictional inquiry focuses on what the IRS *did — i.e.*, whether it '*proceed[ed]* with any administrative or judicial action'" (alteration in original) (quoting *Li v. Commissioner*, 22 F.4th 1014, 1017 (D.C. Cir. 2022))), *aff'g* 160 T.C. 388 (2023); *Whistleblower 972-17W v. Commissioner*, 159 T.C. 1, 9 (2022). Absent stipulation to the contrary, appeal of this case would lie to the D.C. Circuit under section 7482(b), and we thus follow its precedent. *See* § 7482(b)(1) (penultimate sentence); *Berenblatt*, 160 T.C. at 542 n.4; *Kasper v. Commissioner*, 150 T.C. 8, 11 n.1 (2018).[3]

II.    *Summary Judgment Standard*

The purpose of summary judgment is to expedite litigation and avoid costly, unnecessary, and time-consuming trials. *See FPL Grp., Inc. & Subs. v. Commissioner*, 116 T.C. 73, 74 (2001). As a general rule, we may grant summary judgment where there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *See* Rule 121(a)(2); *Sundstrand Corp. v. Commissioner*, 98 T.C. 518, 520 (1992), *aff'd*, 17 F.3d 965 (7th Cir. 1994). But a slightly different standard applies when we review agency action—here, a whistleblower award determination—under the Administrative Procedure Act. *Kasper*, 150 T.C. at 14–15. In such cases we generally "confine ourselves to the administrative record to decide whether there has been an abuse of discretion." *See Van Bemmelen v. Commissioner*, 155 T.C. 64, 78 (2020).

Our Rules recognize this distinction, clarifying that, in cases where judicial review is based solely on the administrative record, Rule

---

[3] In *Kennedy v. Commissioner*, No. 21-1133, 2025 U.S. App. LEXIS 16611, at \*30 (D.C. Cir. July 8, 2025), *aff'g* T.C. Memo. 2021-3, the D.C. Circuit confirmed that we have jurisdiction over a whistleblower claim where "the IRS proceeded with an administrative action: it examined (i.e., audited) the accused taxpayer." This case differs from *Kennedy* in that the examination there was "based on" the whistleblower's information, *id.* at \*31, whereas the examination of Target was already in process when the audit team received the information. But *Kennedy* also differs from this case in a second respect: Here the IRS recovered proceeds by making "adjustments to several issues related to the whistleblower allegations," whereas in *Kennedy* the IRS recovered no proceeds at all. *Ibid.* When the IRS recovers proceeds upon examination of a taxpayer identified by the whistleblower, we necessarily have jurisdiction to determine whether the whistleblower "substantially contributed" to that recovery. As explained more fully below, the regulations indicate that a whistleblower may "substantially contribute" to an action, not only when the IRS "initiates a new action," but also when it "expands the scope of an ongoing action, or continues to pursue an ongoing action." Treas. Reg. § 301.7623-2(b)(1); *see infra* pp. 12–13.

**[\*12]** 121(a)(2) does not apply. Instead, the parties must provide "statement[s] of facts with references to the administrative record." Rule 121(j). In this context summary judgment serves as a mechanism for deciding, as a matter of law, whether the WBO's determinations are supported by the administrative record or (conversely) are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Van Bemmelen*, 155 T.C. at 72 (quoting *Kasper*, 150 T.C. at 21).

In conducting this analysis, we do not substitute our judgment for that of the agency. Rather, we confine ourselves to ensuring that the WBO's determination was "within the bounds of reasoned decisionmaking." *Id.* (quoting *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2569 (2019)). With respect to factual matters, we accept the WBO's determinations so long as they are not clearly erroneous. *See Kasper*, 150 T.C. at 23 (citing *Fargo v. Commissioner*, 447 F.3d 706, 709 (9th Cir. 2006), *aff'g* T.C. Memo. 2004-13).

III.    *Statutory and Regulatory Background*

Section 7623(a) authorizes the payment of sums necessary for "detecting underpayments of tax" or "detecting and bringing to trial and punishment persons guilty of violating the internal revenue laws or conniving at the same." Section 7623(b)(1) provides for nondiscretionary (i.e., mandatory) awards of at least 15% and not more than 30% of the collected proceeds if all stated requirements are met. An award can be paid only if the IRS "proceeds with any administrative or judicial action . . . based on information brought to the Secretary's attention." § 7623(b)(1). The whistleblower is entitled to an award only if the IRS collects money "as a result of the action." *Ibid.* Respondent concedes that the IRS collected proceeds as a result of its 2007–2009 and 2010–2012 examinations of Target.

In 2014 the Treasury Department issued regulations interpreting section 7623(b). T.D. 9687, 2014-36 I.R.B. 486. These regulations define key terms used in the statute and supply examples showing how these definitions apply. *See* Treas. Reg. § 301.7623-2. These regulations apply "to information submitted on or after August 12, 2014, and to claims for award . . . that are open as of" that date. *Id.* para. (f). Petitioner's claim was "open" as of August 12, 2014.

Among the terms defined by the regulations is the verb phrase "proceeds based on." *Id.* para. (b). The IRS "proceeds based on" a whistleblower's information when his information "substantially contributes

**[\*13]** to an action against a person identified by the whistleblower." *Id.* subpara. (1). That is true when the IRS "initiates a new action, expands the scope of an ongoing action, or continues to pursue an ongoing action, that the IRS would not have initiated, expanded the scope of, or continued to pursue, but for the information provided." *Ibid.* On the other hand, the IRS does not "proceed based on" the whistleblower's information when it merely "analyzes the information provided or investigates a matter raised by the information provided." *Ibid.*

This regulation provides two examples that are instructive here. *See id.* subpara. (2) (examples 3 and 4). Example 3 hypothesizes a whistleblower who supplies information that "identifies a taxpayer, describes and documents specific facts relating to the taxpayer's activities, and, based on those facts, alleges that the taxpayer owed additional taxes." *Ibid.* The IRS receives the information after having already initiated an examination of the taxpayer. "During the examination, the information is provided to the Exam team and the Exam team uses the information provided to confirm the correctness of adjustments made based on other information." *Ibid.* The example concludes: "Although the whistleblower's information confirms the correctness of the IRS's adjustments, the IRS does not rely on the whistleblower's information when it makes the adjustments, nor does the information cause the IRS to expand the scope of its examination." *Ibid.* Rather, "[t]he whistleblower's information merely supports information independently obtained by the IRS." *Ibid.* Under these circumstances, the examination "is not an administrative action with which the IRS proceeds based on information provided by the whistleblower," so that the whistleblower is not entitled to a mandatory award. *Ibid.*

Example 4 assumes the same initial facts, with a significant twist. During the examination "the Exam team identifies inconsistencies between the information provided by the whistleblower and other information already in the Exam team's possession." *Ibid.* "The Exam team uses the information provided by the whistleblower to make additional adjustments that it would not have made" on the basis of information it previously possessed. *Ibid.* Under these circumstances, the Example concludes that the whistleblower "substantially contributed to the action" and would be entitled to an award. *Ibid.*

IV.   *Analysis*

Section 7623(b)(1) authorizes the payment of a mandatory award "[i]f the Secretary proceeds with any administrative or judicial

[*14] action . . . based on information brought to the Secretary's attention" by a whistleblower. Respondent concedes that the IRS recovered proceeds from Target by making certain transfer pricing adjustments during the 2007–2009 and 2010–2012 audit cycles. To be entitled to an award, however, petitioner must establish that the exam teams, when setting up these adjustments, were "proceed[ing] . . . based on information" that he supplied. *See* § 7623(b)(1). "[T]he IRS *proceeds based on* information provided by a whistleblower when the information provided substantially contributes to an action against a person identified by the whistleblower." Treas. Reg. § 301.7623-2(b)(1).

Respondent contends that petitioner's information did not "substantially contribute" to the adjustments made by the examination teams, and we agree. In analyzing this question, it is helpful to focus first on the character of the information petitioner supplied. He had no inside knowledge about Target or its tax planning. He had no involvement in the preparation of Target's financial statements or tax returns and no access to its internal documents. Virtually all the information he supplied was derived from publicly available sources, such as newspaper articles, business journals, and SEC filings.

Petitioner was employed by a firm that did SEC filings for large multinational corporations. Given his experience, he was able to scrutinize Target's SEC filings and make an educated guess about transfer pricing issues that might arise during an IRS audit. Petitioner presumably could have reviewed SEC filings by dozens or hundreds of other large multinational corporations, made educated guesses about transfer pricing issues they might have, and filed whistleblower claims targeting them.

By its nature, high-level information of this sort is unlikely to be of great use to experienced IRS examiners who are auditing large multinational companies. And that was what the exam teams found here. Ms. Heinemann, a Senior Team Coordinator for Team 1316, prepared the Form 11369 recommending denial of petitioner's claim for tax years 2007–2011. She found that petitioner had not (1) "identif[ied] specific area(s) of non-compliance" by Target, (2) "provided information that would not be obtained [by the IRS] through general audit . . . techniques," (3) identified any issues "not common to this type of taxpayer," (4) identified any issues "not previously known or well understood by the Service," or (5) identified "connections between transactions, or parties to transactions, that enabled the Service to better understand the tax implications."

**[\*15]** No less important in analyzing the "substantial contribution" question is when the exam teams received petitioner's information. The IRS opened its examination of Target's 2007 and 2008 tax years in June 2010, and the 2009 year was added in June 2011. The exam teams did not receive petitioner's Form 211 until June 26, 2013, by which time the transfer pricing issues had been well fleshed out. The record establishes that the exam teams had identified the issues petitioner listed before receiving his Form 211 and had largely completed their field work by issuing IDRs. Indeed, of the 377 IDRs issued to Target, 288 were directed to the issues that petitioner later identified. Not a single IDR relating to the 2007–2009 examination was issued after June 26, 2013, the date on which the exam team received petitioner's information.

The Form 11369 prepared by Ms. Heinemann confirms that petitioner's information did not assist the examinations in any cognizable way. She verified that (1) the exam teams had begun "identification, audit, and/or investigation of the issues [petitioner] identified" before receiving his information; (2) his information did not "lead to modifications of the audit or investigation plan, such as expanding the scope of the audit"; and (3) his information was not used by the examiners "to develop specific [IDRs], leads, or other inquiries" or to "validate the completeness or accuracy of [Target's] responses [thereto]." To the extent petitioner offered his own theories, computations, and spreadsheets to illustrate Target's supposed tax liabilities, Ms. Heinemann confirmed that he did not supply "relevant technical or legal analysis that saved the IRS work and resources."

Given these findings by the exam teams, the WBO clearly did not abuse its discretion in denying petitioner's claim for an award. The WBO based the denial on its conclusion that "the IRS [had] identified the issues prior to receipt of [petitioner's] information and [his] information did not substantially contribute to the actions taken by the IRS." This conclusion is squarely supported by Ms. Heinemann's and Ms. Sanders's summaries of the findings made by the exam teams.

The WBO's conclusion is likewise supported by the governing regulation. There is no indication here that the exam teams "initiate[d] a new action, expand[ed] the scope of an ongoing action, or continue[d] to pursue an ongoing action, that the IRS would not have initiated, expanded the scope of, or continued to pursue, but for the information provided." *See* Treas. Reg. § 301.7623-2(b)(1). Rather, this is a case where "[t]he whistleblower's information merely support[ed] information independently obtained by the IRS." *Id.* subpara. (2) (example 3). The

[*16] regulation makes clear that a whistleblower's information does not "substantially contribute[] to an action" where the exam team simply "analyzes the information provided or investigates a matter raised by the information" when that matter was already on the exam team's radar screen. *Id.* subpara. (1).

V.     *Petitioner's Arguments*

Against these conclusions petitioner offers an array of arguments, both substantive and procedural.  First, petitioner asserts that its supplemental submissions expanded his award claim to cover tax years 2012–2015.  In petitioner's view, the Confidential Evaluation Report on his claim, which Ms. Heinemann prepared on Form 11369, was deficient because it addressed only tax years 2007–2011.

We disagree.  Petitioner submitted a single Form 211 that alleged tax underpayments by Target for 2007–2011.  That was the "claim for award" that he made; he did not file a separate Form 211 making a claim for 2012–2015.  His supplemental submissions, which consisted of publicly available information, workpapers, and case studies created during 2012–2015, likewise made no distinct "claim for award" with respect to those years.  There is no evidence that the exam team assigned to Target's 2013–2015 audit cycle (which is not identified in the record) ever received petitioner's information.  In any event the exam teams that conducted the 2007–2009 and 2010–2012 audits determined that his supplemental submissions had no "potential for further audit consideration."  *See* IRM 25.2.2.1.1.1(2) (Jan. 12, 2018) (stating that "[s]upplemental information will not be considered for purposes of IRC 7623(b) unless its receipt prompts the IRS to take an administrative or judicial action" that would not have been taken on the basis of earlier-supplied data).

Second, petitioner asserts that the WBO relied upon a "flawed" Form 11369.  Petitioner notes that Ms. Sanders's narrative memorandum, which was attached to the Form 11369, addressed the 2007–2009 examination only.  Petitioner urges that the Form 11369 "[a]t best could only possibly support the denial for the 2007–09 tax cycle."

Again we disagree.  In his ARM recommending denial of petitioner's claim, STA Castellanoz concluded, on his review of the record, that "[t]he [exam] team did not consider the whistleblower information in the 2010–2012 audit cycle."  Petitioner has not shown this factual determination to be "clearly erroneous."  *See Kasper*, 150 T.C. at 23

[*17] (quoting *Fargo v. Commissioner*, 447 F.3d at 709). The record establishes that petitioner's supplemental submissions were forwarded to Ms. Tobin in Group 1235, which conducted the 2007–2009 audit. There is no evidence that Ms. Tobin forwarded any of petitioner's information to anyone in Group 1316, which conducted the 2010–2012 audit. If the 2010–2012 exam team did not consider petitioner's information, petitioner's information cannot have "substantially contributed" to the transfer pricing adjustments for that audit cycle.[4]

Third, petitioner contends that the WBO abused its discretion by issuing a "false or incomplete denial letter." In its Final Determination letter the WBO concluded that petitioner's claim should be denied because petitioner's information "did not substantially contribute to the actions taken by the IRS." In petitioner's view this determination was inadequate because it did not explain "what [petitioner] failed to do."

This contention is meritless. In its Final Determination the WBO accurately summarized the conclusion STA Castellanoz had reached in his ARM: "The field team concluded that there was no specific inside information provided in the initial claim or in the supplemental submissions about [Target's] business operations that had the potential for further audit consideration beyond what the field team had already known and had under examination." STA Castellanoz in turn accurately summarized the findings Ms. Sanders had reached in her July 2015 narrative report: "The Exam Team concluded that there was no specific inside information provided in the initial Claim [or] in the Supplemental Submissions about [Target's] business operations that had the potential for further audit consideration beyond what the Exam Team had already

---

[4] Even if the 2010–2012 exam team were thought to have received petitioner's information, the Form 11369 recommending denial of his claim was prepared by Ms. Heinemann, a senior group coordinator for Group 1316. Her analysis addressed all five years covered by his claim, including 2010 and 2011. In response to the question whether petitioner "provide[d] assistance during the audit or investigation," she answered "No." Petitioner asserts that it was improper for the Form 11369 to include tax years 2010 and 2011 because "the examination of those later years had just begun." But petitioner identified exactly the same tax issues for both audit cycles, and Ms. Heinemann was surely capable of determining, in December 2015, whether petitioner's information was helpful. The 2010–2012 audit closed in December 2017, just eight months after the closing of the 2007–2009 audit.

**[*18]** known and had under examination." These determinations made clear what petitioner "had failed to do."[5]

In preparing the ARM, STA Castellanoz reviewed the case file and confirmed that petitioner's information "was of no value to the field team[s]." The WBO issued petitioner a denial letter stating that "the IRS identified the issues prior to receipt of your information and your information did not substantially contribute to the actions taken by the IRS." We reject out of hand petitioner's contention that the WBO failed to engage in "substantive consideration" of his award claim.

Fourth, petitioner contends that the administrative record does not support denial of his claim. In his view the record "suggests that [the exam teams] did use his information" because the examiners made adjustments "related to" his allegations. He appears to contend that, if the adjustments were *related to* his allegations, those adjustments must have been *attributable to* his allegations.

This argument makes no logical or linguistic sense. The record establishes that the exam teams were aware of—and had already investigated—the transfer pricing issues petitioner listed in his Form 211. To the extent petitioner listed the same issues the examiners had already spotted, the adjustments were obviously "related to" his information. But that is the only sense in which they were related. A whistleblower does not "substantially contribute" to an IRS recovery simply because

---

[5] In a related vein petitioner contends that the WBO abused its discretion by failing to follow the IRM in considering its claim. Petitioner asserts that the Form 11369 and attached narrative memorandum failed to explain "what was known/what issues were identified prior to receiving [petitioner's] information." *See* IRM 25.2.1.5.5(4). "[I]t is 'well-settled' that IRM provisions are 'directory rather than mandatory, are not codified regulations, and clearly do not have the force and effect of law.'" *Whistleblower 14376-16W v. Commissioner*, T.C. Memo. 2024-22, at *31 n.21 (first quoting *Marks v. Commissioner*, 947 F.2d 983, 986 n.1 (D.C. Cir. 1991), *aff'g* T.C. Memo. 1989-575; and then citing *Weiss v. Commissioner*, 147 T.C. 179, 196 (2016) ("The IRM lacks the force of law and does not create rights for taxpayers."), *aff'd*, No. 16-1407, 2018 WL 2759389 (D.C. Cir. May 22, 2018)), *supplementing* T.C. Memo. 2017-181. In any event the relevant documents clearly indicate "what was known [and] what issues were identified" by the exam teams before receiving petitioner's information. *See supra* pp. 5–8.

**[\*19]** the exam team "analyzes the information provided."  Treas. Reg. § 301.7623-2(b)(1).[6]

Fifth, petitioner contends that a NOPA prepared by the exam team, which proposed an adjustment for a CSA buy-in payment, "confirmed his allegations" because it "directly matched his information to such an extent that [it] suggests more than mere coincidence."  Again we are unpersuaded.  The record shows that the exam team was aware of the CSA buy-in issue by the time it received petitioner's supplemental submission on November 20, 2014.  The exam team had already issued IDRs keyed to this issue and had prepared a draft NOPA.  The NOPA was finalized on December 19, 2014, in reliance on an economist's report that had been prepared before petitioner's information was received.  The economist's calculations "matched" petitioner's only in the sense that they relied on the same provisions of the Treasury regulations.

Finally, petitioner reiterates his challenge to the validity of Treasury Regulation § 301.7623-2(b)(1).  Petitioner contends that there is no "substantially contribute" requirement in section 7623(b), that respondent has improperly imported an extra-statutory "substantial contribution" test from the regulation, and that, in the light of *Loper Bright*, no deference should be given to that interpretation.

We disagree.  The D.C. Circuit, to which an appeal of this case would presumptively lie, has recently reexamined the regulation petitioner challenges and has reaffirmed its validity in the post-*Chevron* world.  *See Lissack II*, 125 F.4th at 257. The appellate court specifically ruled that the WBO "'proceeds based on' a whistleblower's information when that information has *substantially contributed* to the IRS's administrative action."  *Id.* (emphasis added).  By "pegging the award amount to the degree of substantiality of the whistleblower's assistance," the court held, section 7623(b) "plainly means that all such awards depend on the whistleblower having contributed in some substantial degree."  *Lissack II*, 125 F.4th at 258.  We accordingly reject petitioner's assertion

---

[6] Petitioner alternatively contends that summary judgment is premature because respondent has failed to file the entire administrative record.  The administrative record consists of numerous documents from the 2007–2009 audit cycle and the 2010–2012 RAR.  By Order served October 16, 2024, we determined that respondent had filed the complete administrative record and we rejected petitioner's demand for additional discovery.  We have no need to address further petitioner's assertion that the administrative record is incomplete.

**[\*20]** that the WBO relied on a "fundamentally flawed" interpretation of the statute in making its determination.[7]

To reflect the foregoing,

*An appropriate order and decision will be entered for respondent.*

---

[7] Petitioner alternatively contends that the D.C. Circuit wrongly decided *Lissack II* because it "read a phantom requirement into I.R.C. § 7623(b)(1)" by requiring "that information provided by a whistleblower 'substantially contributed' to the collection of proceeds." Because appeal of this case would presumptively lie to the D.C. Circuit and because we must follow its precedent, we need address this argument no further.